NOT RECOMMENDED FOR PUBLICATION
File Name: 17a0035n.06

No. 16-5317

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
Jan 17, 2017
DEBORAH S. HUNT, Clerk

ELGENE KENTAE PORTER,

    Petitioner-Appellant,

v.

KEVIN GENOVESE,

    Respondent-Appellee.

)
)
)
)
)
)
)
)
)
)
)

ON APPEAL FROM THE
UNITED STATES DISTRICT
COURT FOR THE MIDDLE
DISTRICT OF TENNESSEE

BEFORE: McKEAGUE, GRIFFIN, and KETHLEDGE, Circuit Judges.

GRIFFIN, Circuit Judge.

In 2006, several masked men entered a professional gambler's home in metropolitan Nashville in an attempt to recover outstanding gambling debts. They looted the house and held a mother and her young daughter hostage for several hours. One robber raped the mother. A jury found petitioner Elgene Porter to be both a robber and the rapist, and convicted him of a myriad of crimes. These convictions resulted in a forty-two year prison sentence.

Porter seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254, contending, among other things, that his trial and appellate counsel provided ineffective assistance in two instances—failing to raise due process arguments under Tennessee law regarding the propriety of his aggravated kidnapping conviction in light of his convictions for attempted aggravated robbery and aggravated rape, and failing to seek relief after the rape victim allegedly made an

exculpatory statement during petitioner's sentencing hearing. The district court denied these

claims as procedurally defaulted. We affirm the judgment of the district court.

I.

The Court of Criminal Appeals of Tennessee summarized the underlying facts:

On the evening of November 21, 2006, the victim and her two-year-old daughter (the "child victim") were at their home in Smyrna. Neither the victim's two stepsons nor her husband, a professional gambler, were at home that evening. Her husband had gone to play poker. After a routine evening, she and the child victim went to sleep in the victim's bed; between 1:30 and 2:00 a.m., she heard her small terrier barking. Believing it was her husband returning home, she got up out of bed, turned on the television so the barking would not wake the child victim, and then went to the bedroom door to let the dog out.

When she opened the door, she saw three men standing at the door pointing guns at her. According to the victim, two of three men were approximately the same height, and they were all wearing dark colored clothes, dark "hoodies," long-sleeved dark shirts, dark (black or navy) ski-masks, and basic wool, work gloves. The men pushed her to the floor in the doorway of her bedroom, and one man bound her feet, wrists, and mouth with duct-tape. The dog kept barking loudly, and another man began to beat the dog. Almost immediately, the men began demanding money. Although the men were mostly covered by their clothing, the victim was able to see that two of the assailants were dark-skinned and that the other assailant was lighter-skinned.

After beating the dog until he went "limp," one of the men carried the dog out of the room by the "nape of his neck[.]" One of the men placed pillows around the child victim on the bed in order to create "an enclosure" for her. The men continued to demand money, and two of the men began ransacking the house looking for money, while the other (a dark-skinned man) stayed and guarded the victim at gunpoint. While guarding the victim, the man fondled her, inserted his gloved finger into her vagina, ordered her to perform oral sex, and put his penis inside her vagina. He then placed the victim up on the bed with her daughter, who had begun to cry, and ordered her to use a vibrator on herself. As the men were leaving, they took a jar of money (containing approximately $50) and the victim's cell phone. They told the victim, "We're going another route. We're going to find your husband." The victim estimated that the ordeal lasted from one and one-half to two hours.

* * *

After initially denying any involvement in the crime, the Defendant stated that he was recruited to commit the robbery by a Laotian man named "Salon Von."

> During the interview, the Defendant admitted that he went inside the victim's house and that he fondled the victim's breasts and inserted his finger into her vagina. The Defendant also made a written statement detailing his participation in the home invasion. Both the videotaped and written statements were entered into evidence.

*State v. Porter*, 2011 WL 915673, at *3–4 (Tenn. Crim. App. Mar. 14, 2011) (footnote omitted). A jury convicted defendant of conspiracy to commit aggravated burglary, aggravated burglary, attempted aggravated robbery, aggravated rape, and two counts of aggravated kidnapping (one for each victim). *Id.* at *4. The trial court sentenced him to a total effective sentence of forty-two years. *Id.* The Tennessee Court of Criminal Appeals affirmed, and the Tennessee Supreme Court denied his application for permission to appeal. *Id.* at *5–15.

Porter filed a seventeen-ground pro se petition for post-conviction relief in the Criminal Court of Rutherford County, Tennessee. Appointed counsel raised eighteen different grounds in an amended petition, without incorporating Porter's pro se petition. The post-conviction court denied the amended petition, and the Tennessee Criminal Court of Appeals affirmed. *See Porter v. State*, 2013 WL 1197730 (Tenn. Crim. App. Mar. 26, 2013). The Tennessee Criminal Court of Appeals denied rehearing, and the Tennessee Supreme Court denied his application for permission to appeal.

He then filed a timely § 2254 petition. Having initially dismissed nearly all of his claims on grounds not pertinent here, the district court appointed counsel for further development of two claims: (1) that counsel was constitutionally ineffective for failing to argue that petitioner's kidnapping convictions violated the Tennessee Constitution's due process guarantee as originally identified in *State v. Anthony*, 817 S.W.2d 299 (Tenn. 1991); and (2) that counsel was constitutionally ineffective for failing to investigate and pursue relief on the basis of an alleged exculpatory statement made by the rape victim at Porter's sentencing hearing. Petitioner did not

present these claims to the Tennessee courts during collateral review.[1]  Finding these claims either insubstantial or constituting claims of ineffective assistance of appellate counsel, the district court held Porter could not overcome his procedural default under *Martinez v. Ryan*, 132 S. Ct. 1309 (2012), *Coleman v. Thompson*, 501 U.S. 722 (1991), and *Hodges v. Colson*, 727 F.3d 517 (6th Cir. 2013), and dismissed the claims (but granted a certificate of appealability as to each).

## II.

Federal habeas corpus proceedings protect individuals held in state custody when that custody violates federal law.  *See Trevino v. Thaler*, 133 S. Ct. 1911, 1916–17 (2013).  Our federalism and comity principles equally protect the states' "firmly established, consistently followed, constitutionally proper procedural rules."  *Id.* at 1917; *see also Coleman*, 501 U.S. at 730–31.  These rules constitute an "independent and adequate state ground" sufficient to bar review in federal court.  *Coleman*, 501 U.S. at 729–30.  That is, in cases where, as here, a prisoner fails to present a federal claim to a state court, and the requested remedy is no longer available, the federal claim is procedurally defaulted and a federal court may not pass on that claim. *Atkins v. Holloway*, 792 F.3d 654, 657 (6th Cir. 2015).

Porter seeks relief from this general rule by way of an exception:  by "demonstrat[ing] cause for the default and actual prejudice as a result of the alleged violation of federal law." *Coleman*, 501 U.S. at 750.  He claims there is cause because his post-conviction counsel was ineffective when he failed to raise these claims during collateral review.  This is an uphill battle.

---

[1]Porter initially raised these claims pro se, but his amended petition filed by post-conviction counsel neither raised these claims, nor incorporated his pro se petition.  He makes no argument that he exhausted these claims by raising them in his pro se petition.

"Historically, the federal courts have held that . . . ineffective assistance of post-conviction counsel . . . cannot establish cause for procedural default." *Hodges*, 727 F.3d at 530; *see also Coleman*, 501 U.S. at 753 ("Attorney ignorance or inadvertence is not 'cause.'"). This changed with the Supreme Court's decision in *Martinez v. Ryan*, which "recogniz[ed] a narrow exception: Inadequate assistance of counsel at initial-review collateral proceedings may establish cause for a prisoner's procedural default of a claim of ineffective assistance at trial." 132 S. Ct. at 1315. There are four elements to this exception:

> (1) the claim of "ineffective assistance of trial counsel" [must be] a "substantial" claim; (2) the "cause" [must] consist[] of there being "no counsel" or only "ineffective" counsel during the state collateral review proceeding; (3) the state collateral review proceeding [must have been] the "initial" review proceeding in respect to the "ineffective-assistance-of-trial-counsel claim"; and (4) state law [must] *require*[] that an "ineffective assistance of trial counsel claim be raised in an initial-review collateral proceeding."

*Trevino*, 133 S. Ct. at 1918 (quoting *Martinez*, 132 S. Ct. at 1318–19) (alterations omitted). At issue here are the first two elements.[2]

First, Porter must establish that his underlying ineffective assistance of trial counsel claims are "substantial," "which is to say that . . . [they have] some merit." *Martinez,* 132 S. Ct. at 1318–19 (citing *Miller–El v. Cockrell,* 537 U.S. 322 (2003)). Or, in certificate of appealability parlance, it is "debatable among jurists of reason." *Abdur'Rahman v. Carpenter*, 805 F.3d 710, 713 (6th Cir. 2015); *see also Atkins*, 792 F.3d at 660 ("The Court in *Martinez* cited *Miller-El v. Cockrell* . . . for purposes of defining a 'substantial claim,' and Cockrell describes the standard for issuing a COA."). In the converse, a claim is insubstantial when "it does not have any merit,"

---

[2]In *Trevino*, the Supreme Court held that where a state's "procedural framework, by reason of its design and operation, makes it highly unlikely in a typical case that a defendant will have a meaningful opportunity to raise a claim of ineffective assistance of trial counsel on direct appeal, . . . *Martinez* applies." 133 S. Ct. at 1921. Tennessee's procedural framework falls within *Trevino*'s paradigm. *See Sutton v. Carpenter*, 745 F.3d 787, 792–96 (6th Cir. 2014).

"is wholly without factual support," or when "the attorney in the initial-review collateral proceeding did not perform below constitutional standards." *Martinez*, 132 S. Ct. at 1319. The mere grant of a COA does not, in and of itself, satisfy a claim's substantiality. *Atkins*, 792 F.3d at 660–61.

Second, Porter must also establish he received ineffective assistance of counsel during his initial-review collateral proceeding under the familiar *Strickland* standards. *Martinez*, 132 S. Ct. at 1318. Under *Strickland v. Washington*'s two-prong test, a person challenging his counsel's representation must show (1) deficient performance, *i.e.*, that "counsel's representation fell below an objective standard of reasonableness" and (2) prejudice. 466 U.S. 668, 687–88, 691–92 (1984). Courts must "apply a 'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance." *Harrington v. Richter*, 562 U.S. 86, 104 (2011) (quoting *Strickland*, 466 U.S. at 689). To establish prejudice, a challenger must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A 'reasonable probability' is a probability 'sufficient to undermine confidence in the outcome,' but something less than a showing that the outcome more likely than not would have been different." *Bigelow v. Williams*, 367 F.3d 562, 570 (6th Cir. 2004) (quoting *Strickland*, 466 U.S. at 693, 694). This "difference" is "slight and matters 'only in the rarest case.'" *Harrington*, 562 U.S. at 112 (quoting *Strickland*, 466 U.S. at 697).

We review de novo the district court's legal conclusions and mixed questions of law and fact. *Hodges*, 727 F.3d at 525. "Whether a petitioner's federal habeas claim is barred by procedural default is a question that we review de novo." *Id.* at 529 (citation and footnote omitted).

III.

A.

Porter claims he was improperly convicted of two counts of aggravated kidnapping because the imprisonment effectuated to accomplish the two underlying convictions (attempted aggravated robbery and aggravated rape) did not further the kidnapping. "False imprisonment" is an element of aggravated kidnapping, which occurs when one "knowingly removes or confines another unlawfully so as to interfere substantially with the other's liberty." Tenn. Code Ann. §§ 39-13-302, 39-13-304(a). Tennessee law recognizes that this false imprisonment element sometimes overlaps with elements of other crimes that also require restrictions on a victim's liberty. That recognition, set forth in *State v. Dixon*, 957 S.W.2d 532 (Tenn. 1997), is at the crux of Porter's appeal: "separate kidnapping convictions may violate due process when kidnapping is essentially incidental to other offenses for which a defendant has been convicted." *Id.* at 533.

To understand *Dixon*, we begin with its predecessor—*State v. Anthony*. In that case, the Tennessee Supreme Court first expressed its concern that Tennessee's kidnapping statute "could literally overrun several other crimes, notably robbery and rape, . . . since detention and sometimes confinement, against the will of the victim, frequently accompany these crimes." 817 S.W.2d at 303 (citation omitted). It then set forth the following rule for courts to evaluate "the propriety of a kidnapping conviction where detention of the victim is merely incidental to the commission of another felony, such as robbery or rape" in order to not violate Tennessee's constitutional due process guarantee:

> We conclude that the better rule is . . . whether the confinement, movement, or detention is essentially incidental to the accompanying felony and is not, therefore, sufficient to support a separate conviction for kidnapping, or whether it is significant enough, in and of itself, to warrant independent prosecution and is, therefore, sufficient to support such a conviction.

*Id.* at 300, 306. "[W]hether a detention or movement is incidental to another offense is highly dependent on the facts in each case." *Id.* at 306. In *Anthony* (and its consolidated case, *State v. Martin*), the defendants entered businesses, robbed the businesses (and ordered their employees around) at gunpoint, and then instructed the employees to remain in bathrooms while they left. *Id.* at 301–02. The Tennessee Supreme Court found these actions to be merely incidental to the robberies and reversed the defendants' kidnapping convictions on due process grounds. *Id.* at 307.

In *Dixon*, the Tennessee Supreme Court tempered this "essentially incidental" test, commenting that "*Anthony* and its progeny . . . are not meant to provide the rapist a free kidnapping merely because he also committed rape." 957 S.W.2d at 534. Rather, held the Tennessee Supreme Court, "the *Anthony* decision should only prevent the injustice which would occur if a defendant could be convicted of kidnapping where the only restraint utilized was that necessary to complete the act of rape or robbery. Accordingly, any restraint in addition to that which is necessary to consummate rape or robbery may support a separate conviction for kidnapping." *Id.* at 534–35. It then crafted a two-part test that replaced *Anthony*'s "essentially incidental" standard:[3] First, was "the movement or confinement . . . beyond that necessary to consummate the [other felony]. . . . If so, the next inquiry is whether the additional movement or

---

[3]In *State v. Richardson*, the Tennessee Supreme Court clarified that this two-prong test "fully replace[d] the *Anthony* 'essentially incidental' analysis," and that "[t]he *Dixon* test should be used exclusively in all future inquiries." 251 S.W.3d 438, 443 (Tenn. 2008). This was short-lived. The Tennessee Supreme Court subsequently held that this test was no longer a function for the judiciary. *State v. White*, 362 S.W.3d 559, 577–78 (Tenn. 2012) (reversing *Anthony* and its progeny). Rather, "whether the evidence, beyond a reasonable doubt, establishes each and every element of kidnapping, as defined by statute, is a question for the jury properly instructed under the law." *Id.* at 577. The Tennessee Supreme Court issued *White* on March 9, 2012— nearly a year after it denied direct review of Porter's conviction and sentence—and did so by expressly noting that *White* did "not articulate a new rule of constitutional law or require retroactive application." *Id.* at 578. As such, *White* is of no import to Porter's petition.

confinement: (1) prevented the victim from summoning help; (2) lessened the defendant's risk of detection; or (3) created a significant danger or increased the victim's risk of harm." *Id.* at 535. In application, the *Dixon* court had little trouble finding no due process problem with the defendant's kidnapping conviction—he jumped the victim from behind, dragged her from a sidewalk to a concealed location, and then beat and attempted to rape her. *Id.* at 533. This additional confinement was not incidental to the sexual assault because it was not necessary to move the victim in order to consummate the attempted sexual assault. *Id.* at 535.

Porter contends both his trial and appellate counsel were ineffective by failing to argue his kidnapping convictions did not meet this standard, writing in his petition as follows:

> Defense counsel failed to argue at the sentencing and on first tier direct appeal that, under the facts and circumstances of the case, and under the due process protection afforded citizens under Article I, Section 8 and Article XI, Section 16 of the Tennessee Constitution and of the Fifth and Fourteenth Amendments to the Constitution of the United States and following the analysis of *Anthony* and its progeny, that the multiple convictions in Mr. Porter's case should merge into one conviction.[4]

As his post-conviction counsel did not raise this as a claim for relief, Porter argues we should excuse his procedural default under *Martinez*.

B.

Preliminarily, *Hodges* forecloses Porter's position that his collateral counsel's failure to raise an ineffective assistance of appellate counsel claim permits this court to excuse his procedural default. 727 F.3d at 531 ("[I]neffective assistance of post-conviction counsel *cannot supply cause* for procedural default of a claim of ineffective assistance of appellate counsel."

---

[4]A "first tier" appeal is an appeal taken from a trial court to a court of appeals, and a "second tier" appeal is a discretionary appeal from the court of appeals to the court of last resort. *See Weston v. State*, 60 S.W.3d 57, 59 (Tenn. 2001); *Pinkston v. State*, 668 S.W.2d 676, 676 (Tenn. Crim. App. 1984); *see generally Hardaway v. Robinson*, 655 F.3d 445, 450 (6th Cir. 2011).

(emphasis added)). Yes, the Ninth Circuit sees this differently. *See Ha Van Nguyen v. Curry*, 736 F.3d 1287, 1289 (9th Cir. 2013). But this does not, as Porter argues, mean that there is "cause" to excuse his default because "it is 'debatable' under *Miller-El* whether claims of ineffective-assistance-of-appellate-counsel fall within the ambit of *Martinez*." This creative argument conflates the elements required to fit within *Martinez/Trevino*'s exception with that exception's scope. To excuse his procedural default under the limited exception, Porter must show both that his claim of "ineffective assistance of *trial counsel*" was "substantial" and that he has "cause" to excuse his default by way of collateral counsel's ineffective assistance. *Trevino*, 133 S. Ct. at 1918 (emphasis added). He cannot avoid the emphasis here—the law of this circuit is that *Martinez/Trevino*'s limited exception does not extend to claims of ineffective assistance of appellate counsel. *Hodges*, 727 F.3d at 531. Absent en banc review or an intervening and binding change in the state of the law (which Porter does not argue), this panel may not revisit *Hodges*. *See Bennett v. MIS Corp.*, 607 F.3d 1076, 1095 (6th Cir. 2010).

Accordingly, the district court correctly dismissed Porter's claim as it pertains to ineffective assistance of appellate counsel.

C.

That leaves us with his trial counsel claims, one for the child and one for the mother. We examine each in turn.

1.

The district court correctly concluded Porter's kidnapping conviction for the child did not present any due process concerns under Tennessee law, as the child was not the victim of petitioner's underlying offenses. *See State v. Teats*, 468 S.W.3d 495, 503–04 (Tenn. 2015). Despite conceding the correctness of this conclusion, Porter asks that we read his *Anthony*

merger claim as one that is really a challenge to the sufficiency of the evidence given the supposed dearth of evidence showing the child's liberty was restrained.

We decline to do so. For one, his petition does not raise a *Jackson v. Virginia*, 443 U.S. 307 (1979), type sufficiency of the evidence argument as to this claim. Rather, and liberally construing his pro se petition (and, not to mention, his counsel's accompanying briefing, which focuses solely on the *Anthony/Dixon* line of cases), his petition makes clear that this claim raises a due process challenge as to merger, which is different from a due process challenge as to sufficiency of the evidence. *See, e.g.*, *Thorne v. Lester*, 641 F. App'x 541, 543 (6th Cir. 2016) (rejecting similar argument). His newfound sufficiency of the evidence claim thus falls outside the scope of the certificate of appealability, and we will not consider it. *See Hall v. Warden, Lebanon Correctional Inst.*, 662 F.3d 745, 752–53 (6th Cir. 2011).

2.

There is no debating that the robbers extensively restricted the mother's liberty during the hour-plus long ordeal. They pushed her to the floor in the doorway to her bedroom, and duct taped her mouth around her head, her hands, and her feet. The extensive binding led to her losing feeling in her legs and hands, her feet turned purple, and she could not support her own weight when attempting to walk. A single robber also stood as an armed guard over her (and her child) in the bedroom, while the others searched the house for money. While in the bedroom, she was moved from laying on the floor, to sitting up against the bed, to being placed in her bed with her child. The guard sexually assaulted her on four different occasions—rapes the other robbers periodically interrupted by inquiring as to where she thought the money might be.

On this basis, the district court concluded Porter could not satisfy *Strickland*'s "reasonable probability" standard to show prejudice:

> The fact that the adult victim's hands, feet, and mouth were duct-taped, even though the victim was also subdued at gunpoint, fairly dictates a conclusion that the degree of restraint went beyond that necessary for the consummation of the attempted robbery or the rape, for purposes of the first prong of the *Dixon* analysis. As for the second prong, the duct-taping had the effect of preventing the victim from screaming, using the phone, or running for help. The fact that she was able to free herself from the bindings after the perpetrators left her house does not compel a different conclusion.

(Internal citations omitted.) Porter argues the district court erred in applying *Dixon*'s first prong—"the movement or confinement was beyond that necessary to consummate" the aggravated robbery and rape. In his view, the mother's binding and confinement was just necessary to facilitate the robbery, and no more. He does not contest the district court's finding as to the second prong.

In support, Porter contends *State v. Coleman*, 865 S.W.2d 455 (Tenn. 1993), controls. We disagree. There, the defendant and an accomplice robbed a shoe store by gunpoint. *Id.* at 456–57. After the victim handed over the money, the defendant ordered her to move to the back of the store and then to a side room, threatened to kill her, and raped her at gunpoint. *Id.* at 457. The Tennessee Supreme Court found that under *Anthony* (*Coleman* was pre-*Dixon*), an aggravated kidnapping conviction could not lie in addition to rape and robbery convictions:

> There is ample evidence in this record to establish that appellant's intent in entering the store was to commit armed robbery. This was the primary offense. The abduction was for the purpose of facilitating his escape and was essentially incident to the robbery.
>
> It was after he determined that her employer was not present in the backroom that he told her "he could blow her _____ _____ head off for lying to him." Under threat of death he made her get up from the floor and enter the side room where she was raped. The facts of this case fully support convictions of two separate offenses: the aggravated robbery and the aggravated rape. They do not support the kidnapping conviction under the *Anthony* rule.

*Id.* at 457. As the state properly notes, this case is distinguishable on account of not involving physical restraint in addition to being held at gunpoint.

-12-

However, the state's main case, *State v. Fuller*, 172 S.W.3d 533 (Tenn. 2005), is also not dispositive. There, the perpetrators broke into the victims' house, demanding money at gunpoint. Upon realizing they broke into a different house than intended, they stole some money from the victims, and then bound and questioned both for about forty minutes. They left the female in a bedroom and forced the male outside to show them the correct house. Upon returning to the house with the male, the perpetrators placed the male in the bedroom, stuck a gun in each of their mouths, ordered the couple to turn around, and threatened them to not interfere before leaving. *Id.* at 534–35. This confinement satisfied *Dixon*: the perpetrators had already completed the robbery (taking money) before binding the victims and questioning them to determine the location of the correct home—the binding was not "for the sole purpose of facilitating the robbery or their escape." *Id.* at 537. Given this temporal emphasis between the completion of the robbery and confinement, *Fuller* is not decisive here.

Rather, application of *Dixon*'s first prong to the facts presented here is best illustrated by the Tennessee Supreme Court's decision in *Richardson*, a decision that is on all fours with the facts presented here. *Richardson* involved a brutal attempted armed robbery of a restaurant where the defendant worked. He forced one manager into a stock room by gunpoint and then struck her head with the gun, causing her to fall to the floor. He then demanded another manager open a safe in an office (again, by gunpoint), but when the manager had trouble opening it, he severely beat her. During this beating, defendant's accomplice bound the first manager's hands with duct tape. The defendant then dragged the second manager into another room, beat her some more, and left, threatening to kill her if she moved. The two tried again to open the safe to no avail, and left the restaurant. 251 S.W.3d at 439–40.

In reversing the Tennessee Court of Criminal Appeals' holding that the kidnappings were essentially incidental to the attempted aggravated robbery, the Tennessee Supreme Court emphasized that application of the *Dixon* test (1) does not depend upon an attempt conviction, and (2) remains a fact-sensitive one:

> Our analysis does not differ when the kidnapping conviction is accompanied by a conviction for criminal attempt. A defendant may be convicted of criminal attempt based on conduct constituting a substantial step toward the commission of the offense. Conduct does not constitute a substantial step, however, "unless the person's entire course of action is corroborative of the intent to commit the offense." *For due process purposes, we likewise must take into account that a defendant intends to commit an offense, not an attempt. We must consider a defendant's entire course of action*. We therefore reject the view that after an initial substantial step toward the commission of the offense, any movement or confinement of the victim always will be beyond that necessary to consummate the attempt. At the other end of the spectrum, we also reject the view that because an attempt continues until a defendant's efforts are abandoned, any movement or confinement of the victim never will be beyond that necessary to consummate the attempt. In short, *no bright line exists* for making the threshold determination in the first prong of the *Dixon* test. *The inquiry is fact-driven*.

*Id.* at 443 (internal citation omitted; emphasis added); *see also Fuller*, 172 S.W.3d at 538 ("[T]he determination of whether a detention or movement is incidental to another offense is highly dependent on the facts in each case." (quoting *Anthony,* 817 S.W.2d at 306)). Accordingly, held *Richardson*, "[d]istance of the victim's movement and duration or place of the victim's confinement are factors to be considered in determining if the movement or confinement was beyond that necessary to consummate the accompanying felony." 251 S.W.3d at 443.

The court then concluded that the detention of both managers satisfied *Dixon*'s first prong. As to the first manager:

> Howell informed Richardson as they walked to the stock room that Lucas was in the office. *Rather than leading Howell to the office where the safe was located, Richardson moved her to an empty stock room.* Howell provided Richardson's accomplice with the combination to the safe while she was confined. Richardson's accomplice then bound Howell's hands behind her back. Howell *continued to be bound and confined for over twenty minutes.* While Howell's

> movement to and confinement in the stockroom may have been helpful to Richardson, we conclude that this movement and confinement were beyond that necessary to consummate the attempted especially aggravated robbery.

*Id.* at 444 (emphasis added). And as to the manager the defendant severely beat while trying to open the safe:

> The confinement of Lucas to the office and her movement and confinement to the fan room also were beyond that necessary to consummate the attempted especially aggravated robbery. After Lucas unsuccessfully attempted to open the safe and provided Richardson with the combination to unlock the safe, *Richardson continued to confine Lucas to the office while beating her for approximately twenty minutes*. Although the use of force is not a direct element of *Dixon's* first prong, *the length of time that Richardson beat Lucas in the office is relevant to show that the restraint was excessive and beyond that necessary to consummate the attempted especially aggravated robbery*. Moreover, we reject the suggestion that a twenty-minute beating of Lucas as she lay curled on the floor was designed to assist in procuring Lucas' cooperation in opening the safe. *Instead, we conclude that the use of force for an excessively long period shows that Lucas was no longer confined to assist in opening the safe*.
>
> Even if Lucas' confinement in the office had not been sufficient to meet the first prong of the *Dixon* test, *the subsequent movement and confinement of Lucas to the fan room clearly went beyond that necessary to consummate the attempted especially aggravated robbery*. Lucas gave Richardson the combination to the safe after attempting unsuccessfully to open it. At that point, Richardson either could have continued his attempt to open the safe with Lucas in the office or abandoned his efforts and left the restaurant without moving Lucas. Richardson, however, moved Lucas to the fan room . . . "to shut her up."

*Id.* at 445 (emphasis added).

The same is true here. The robbers bound the mother's hands, feet, and mouth. They also held her at gunpoint. On top of that, they confined her movement to a single room for at least an hour and a half while they ransacked the house looking for money (instead of, for example, taking her around the house to help the robbers look for the money). In this regard, the district court correctly concluded "the degree of restraint went beyond that necessary for the consummation of the attempted robbery or the rape."

-15-

Porter resists this conclusion, citing *State v. Griffin*, 2002 WL 1482689 (Tenn. Crim. App. Mar. 15, 2002); *State v. Sanders*, 842 S.W.2d 257 (Tenn. Crim. App. 1992); and *State v. Mosely*, 1992 WL 85799 (Tenn. Crim. App. April 29, 1992), for the proposition that "Tennessee courts have repeatedly found the binding of a victim with duct tape to be incidental to the accompanying rape or robbery," even when the perpetrators also held victims at gunpoint. Our review of Tennessee case law does not support this conclusion. *See, e.g.*, *State v. Ward*, 2010 WL 1949155, at *2–3, *9 (Tenn. Crim. App. Oct. 13, 2010) (no due process violation involving physical restraint, movement, and gunpoint); *State v. Majors*, 2010 WL 2483512, at *6 (Tenn. Crim. App. June 21, 2010) (no due process violation involving attempted physical restraint, movement, and gunpoint); *State v. Jones*, 2005 WL 1848476, at *2–3 (Tenn. Crim. App. Aug. 4, 2005) (no due process violation involving physical restraint and gunpoint); *State v. McAnally*, 2004 WL 1872899, at *5 (Tenn. Crim. App. Aug. 20, 2004) (similar, and noting that the tying of arms *or* feet would have been sufficient, but the tying of both together was excessive).

*Griffin*, it is true, is a firearm-plus-restraint armed robbery case where the Tennessee Criminal Court of Appeals found a due process violation, but it is distinguishable. In that case (which is pre-*Fuller* and pre-*Richardson*), the robbers just bound the victim's hands and forced him to lay on the floor while they robbed his house. 2002 WL 1482689, at *3, *9. "[The] risk [of harm to the victim] was not substantially greater than that necessarily inherent in the robbery" concluded the Tennessee Criminal Court of Appeals. *Id.* at *9. The restraint applied here far exceeds *Griffin*—they bound the mother's hands, feet, *and* mouth, *and* held her at gunpoint, *and* confined her to her bedroom for at least an hour and a half. As the Tennessee Supreme Court recognized in *Fuller* when it also distinguished the cases relied upon by *Griffin*,

"the binding of the victims [in those cases] did not increase the risk of harm over and above that necessarily present in the crime of robbery itself." 172 S.W.3d at 538. That is not the case here.[5]

Accordingly, we conclude Porter has not established that it is reasonably probable that the trial court would have concluded the restraint effectuated upon the mother did not go beyond that necessary to consummate the robbery under prong one of *Dixon*.[6] Porter has not shown that his claim of ineffective assistance of trial counsel as to the kidnapping of the mother is substantial and, thus, cannot overcome his procedural default.

IV.

Petitioner's second claim relates to his aggravated rape conviction. He testified at his sentencing hearing, at which time Porter's family members allegedly overheard the rape victim say that Porter was not the person who raped her after listening to "his voice or speech pattern"—Porter apparently has a pronounced speech impediment. Porter's mother notified his trial counsel about this by way of a letter four days before a hearing on a motion for a new trial. His trial counsel raised the letter with the court, and requested that the court "bifurcate and allow an amendment of the motion for new trial" so that he could gather sufficient proof as to the claim before presenting it to the court. The trial court denied the motion. Porter did not raise this issue during his direct appeal or during post-conviction proceedings.

---

[5]*Sanders* and *Mosely* are distinguishable as they are *Anthony* cases that do not apply *Dixon*'s subsequent two-prong refinement. *Sanders*, 842 S.W.2d at 260; *Mosely*, 1992 WL 85799, at *3.

[6]Porter does not contest the district court's conclusion that this additional confinement satisfied *Dixon*'s second prong. Nor could he. It prevented the mother from summoning help, thereby lessening the robbers' risk of detection. And it also increased her risk of harm—the binding made her lose feeling in her extremities, turning them purple and preventing her from walking, and restricted her ability to fight off Porter's various sexual assaults. *See Dixon*, 957 S.W.2d at 535; *see also Richardson*, 251 S.W.3d at 444–45.

In his pro se § 2254 petition, Porter framed the failure to pursue this issue any further as constituting ineffective assistance of appellate counsel: "Defense counsel was ineffective . . . on first tier direct appeal in failing to file a motion to stay the proceeding" to pursue a writ of "error coram nobis" regarding this allegedly exculpatory evidence. Under Tennessee's criminal code, a *coram nobis* writ provides relief to convicted defendants in the form of a new trial as follows:

> The relief obtainable by this proceeding shall be confined to errors dehors the record and to matters that were not or could not have been litigated on the trial of the case, on a motion for a new trial, on appeal in the nature of a writ of error, on writ of error, or in a habeas corpus proceeding. Upon a showing by the defendant that the defendant was without fault in failing to present certain evidence at the proper time, a writ of error coram nobis will lie for subsequently or newly discovered evidence relating to matters which were litigated at the trial if the judge determines that such evidence may have resulted in a different judgment, had it been presented at the trial.

Tenn. Code Ann. § 40-26-105(b). "The plain and ordinary meaning of the term 'litigated on or at the trial' in the context of criminal prosecutions refers to a contested proceeding involving the submission of evidence to a fact-finder who then must assess and weigh the proof in light of the applicable law and arrive at a verdict of guilt or acquittal." *Frazier v. State*, 495 S.W.3d 246, 250 (Tenn. 2016) (brackets omitted). It is "an extraordinary procedural remedy which rarely produces results favorable to a criminal defendant." *State v. Hall*, 461 S.W.3d 469, 495 (Tenn. 2015).

The district court construed petitioner's claim as one of ineffective assistance of appellate counsel and held *Hodges* precluded a finding of cause under *Martinez/Trevino*. We agree. It is, of course, well-settled that "[t]he allegations of a pro se habeas petition . . . are entitled to a liberal construction," including construing the petition "to encompass any allegation stating federal relief." *Franklin v. Rose*, 765 F.2d 82, 85 (6th Cir. 1985) (per curiam) (citation omitted). But this leniency lens "is not boundless." *Martin v. Overton*, 391 F.3d 710, 714 (6th Cir. 2004).

Pro se status neither "abrogate[s] basic pleading essentials" nor "require[s a] court to conjure up unplead[ed] allegations." *Wells v. Brown*, 891 F.2d 591, 594 (6th Cir. 1989) (citations omitted). Here, Porter's petition as a whole sets forth claims against his trial counsel, appellate counsel, and both. And as it relates to this issue, he *expressly* framed the claim as one involving counsel's "ineffective[ness] on first tier direct appeal," adding that "[t]he failure [of] defense counsel to appeal this . . . issue amounted to ineffective assistance of counsel." As the district court correctly observed:

> [T]he claim is unambiguously articulated as one of ineffective assistance of appellate counsel. Moreover, the petitioner was undoubtedly aware that his attorney raised the issue of the purported new evidence in the hearing on the motion for a new trial and apparently contends that his appellate counsel was deficient for not further pursuing the issue on appeal or by staying the appeal and filing a *coram nobis* petition.

Although we must liberally construe his petition, Porter is still its master. *See The Fair v. Kohler Die & Specialty Co.*, 228 U.S. 22, 25 (1913) ("[T]he party who brings a suit is master to decide what law he will rely upon."). Thus, we will not rewrite his petition by reading the express modifying language regarding "first tier direct appeal" to also include a claim against his trial counsel. The district court correctly concluded this claim was limited to a claim against his appellate counsel and did not fit within *Martinez/Trevino*'s limited exception.

V.

For these reasons, we affirm the judgment of the district court.